**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**Holding a Criminal Term**
**Grand Jury Sworn in on April 30, 2026.**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CRIMINAL NO.** |
| **v.** | **VIOLATIONS:** |
| **MWASI SONGAMBELE,**<br>**(Counts 1, 6 – 10)** | **<u>Count 1</u>: 18 U.S.C. § 1349**<br>**(Conspiracy to Commit Health Care Fraud)** |
| **MAYA CHEYO,**<br>**(Counts 1 – 3)** | **<u>Counts 2-9</u>: 18 U.S.C. § 1347**<br>**(Health Care Fraud); 18 U.S.C. § 2**<br>**(Aiding and Abetting and Causing an Act to Be Done)** |
| **VANESSA KUH**<br>**(Counts 1, 4 – 5)** | **<u>Count 10</u>: 18 U.S.C. § 1956((h)**<br>**(Conspiracy to Commit Laundering of Monetary Instruments)** |
| **Defendants.** | **<u>Criminal Forfeiture</u>: 18 U.S.C. § 982(a)(1) & (7); 28 U.S.C. § 2461(c), and 21 U.S.C. § 853(p)** |

## INDICTMENT

The Grand Jury for the District of Columbia charges that, at times material to this Indictment, on or about the dates and times stated herein:

## GENERAL ALLEGATIONS

1. Beginning in or about January 2022 and continuing through in or about February 2025, in the District of Columbia and elsewhere, Defendants MWASI SONGAMBELE, and MAYA CHEYO, VANESSA KUH, CO-CONSPIRATOR 1, CO-CONSPIRATOR 2, CO-CONSPIRATOR 3, and others known and unknown to the Grand Jury (the "CO-CONSPIRATORS"), agreed and conspired together and with others to, and engaged in a scheme to, defraud the District of Columbia's Medicaid program, and did in fact defraud the District of Columbia's Medicaid Program, by engaging in a scheme that caused, among other things, bills to be submitted for mental-health related services to juveniles that grossly inflated the amount of time spent conducting services, or were based on services that did not occur. As a result of these corrupt billing practices, Medicaid was defrauded out of millions of dollars.

### D.C. Medicaid and Behavioral Health Regulatory Framework

2. Medicaid is a medical assistance program established by Congress under Title XIX of the Social Security Act of 1965 (the "Medicaid Act"). Medicaid is overseen and administered by the Centers for Medicare and Medicaid Services ("CMS"), an agency within the United States Department of Health and Human Services ("HHS") and provides medical insurance coverage primarily to individuals whose incomes fall below a certain financial threshold as measured against the poverty line. Under the Medicaid Act, each state, and the District of Columbia, is required to promulgate and administer its own plan for medical assistance in accordance with federally established minimum requirements. In the District of Columbia, the Medicaid program is administered by the District of Columbia's Department of Health Care Finance ("DHCF"), located at 441 4th Street, NW, Washington, D.C. Medicaid is jointly funded by the federal government and the District of Columbia, with the federal government paying approximately 70% of the costs

of the Medicaid program.

3. The term "health care benefit program" is defined in 18 U.S.C. § 24(b) as "any public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service for which payment may be made under the plan or contract" and includes the D.C. Medicaid program. 18 U.S.C. § 24(b). Medicaid operates as a vendor payment program, with payments made directly to the providers.

4. Low-income families, children, and disabled adults who meet certain eligibility requirement, such as income and asset criteria, are eligible for Medicaid in the District of Columbia. Individuals who receive benefits under Medicaid are referred to as Medicaid "recipients."

5. Healthcare providers seeking to provide services to recipients must apply for and obtain a provider number. Once issued a provider number, a healthcare provider may file claims to obtain reimbursement for services provided on behalf of recipients. Such claims are required to set forth, among other information, the recipient's name, the Medicaid identification number, the services that were performed for the recipient, the date the services were performed, and the cost of the services. Payments for services are generally made directly to the provider based on the provider's submitted claims.

6. In Washington, D.C., behavioral health services were administered by the D.C. Department of Behavioral Health ("DBH"). As the primary mental health authority in D.C., DBH was responsible for implementing and overseeing D.C.'s Mental Health Rehabilitative Services ("MHRS") program, a program covered by Medicaid. MHRS services were intended to assist eligible beneficiaries navigate and alleviate the impact of mental and behavioral health issues.

Beneficiaries who received MHRS were often referred to as "consumers."

7. Under the MHRS program, Medicaid covered and reimbursed standard behavioral health services, such as Community Support services. Community Support services included, among other things, assistance and support for mental-health consumers to increase social support skills and ameliorate life stressors, individual mental health interventions, and the development of mental health relapse prevention strategies. Community Support services were provided by a consumer's Community Support Worker ("CSW") under the auspices of a certified Medicaid Provider known as a Core Services Agency ("Provider"). When CSWs provide Community Support services to consumers, they are often referred to as "encounters."

8. Providers were required to maintain up-to-date records and to accurately document all MHRS encounters billed under the Provider's electronic medical records ("EMR") system. In D.C., Providers typically used an EMR platform called Credible. In order to be reimbursed by Medicaid for all MHRS services provided to consumers, CSWs were required to document the services in Credible by inputting clinical encounter notes that included, among other information, consumer information, treatment notes, and dates and times of service. CSWs were authorized to conduct encounters in several ways, including by telephone. A "tele" visit indicated a telephonic or virtual encounter with a consumer. CSWs were required to validate the accuracy of the services by signing their names electronically in Credible. Once a CSW submitted an encounter note into Credible for reimbursement, Providers were required to review the notes for accuracy and approval prior to submission to Medicaid for reimbursement.

9. In Washington, D.C., MHRS encounters with consumers were billed in "units," which were equivalent to 15 minutes of time providing services. Community Support services were assigned billing code H0036 and reimbursed by Medicaid at a rate of approximately $103.08

for four units. DBH regulations required the actual start and stop time of MHRS encounters to be used to calculate the duration of the service. For purposes of reimbursement, Medicaid authorized service encounters exceeding seven minutes to be rounded to the nearest whole unit.

10. Providers, as well as all employees of Providers, including CSWs, were required to know, understand, and follow all federal and local laws, including Medicaid rules and regulations applicable in Washington D.C.

**Relevant Entities and Individuals**

11. QUALITY HEALTHCARE SERVICES, LLC ("QUALITY") was a Medicaid Provider headquartered at 1818 New York Avenue, Suite 222, in Washington, D.C. At all relevant times, QUALITY was authorized to provide MHRS services to youth and adolescents who were Medicaid beneficiaries in the District of Columbia. At all relevant times, the services that QUALITY was authorized to provide included Diagnostic/Assessment, Medication/Somatic Treatment, Counseling and Psychotherapy, and Community Support services, in accordance with Chapter A34 of Title 22 of the District of Columbia Code of Municipal Regulations. On September 14, 2020, QUALITY entered into a service agreement with DHCF to provide Mental Health Clinic Services, Psychiatric Services, and Medicare Part B Services.

12. MWASI SONGAMBELE ("SONGAMBELE") was a resident of Laurel, Maryland. SONGAMBELE was listed as "Governor" on QUALITY'S original Certificate of Organization and appeared to be the controlling executive of QUALITY who ran the day-to-day operations of the company. At times relevant to the indictment, SONGAMBELE exercised oversight over multiple CSWs, including the CO-CONSPIRATORS, and, among other things, instructed employees on how to document and bill for services. In addition, SONGAMBELE sometimes performed CSW services for consumers at QUALITY and caused claims to be

submitted to Medicaid for reimbursement.

13. MAYA CHEYO (also known as MWAYA SONGAMBELE, MWAYA CHEYO) (hereinafter, "CHEYO") was a resident of Brambleton, Virginia, and SONGAMBELE's daughter. CHEYO served QUALITY'S Chief Operations Officer ("COO") and Human Resources Director. CHEYO was listed as "owner primary contact" on company documents. At times relevant to the indictment, CHEYO also performed CSW services for consumers at QUALITY and caused claims to be submitted to Medicaid for reimbursement.

14. Beginning in or about September 2022, VANESSA KUH ("KUH") was a resident of Lanham, Maryland, and was employed as a CSW by QUALITY, where she was tasked with providing Community Support services. As part of her duties, KUH caused claims to be submitted to Medicaid for reimbursement.

15. CO-CONSPIRATOR 1 was a resident of Silver Spring, Maryland and was employed as a CSW by QUALITY beginning in or about August 2022. As part of their duties, CO-CONSPIRATOR 1 caused claims to be submitted to Medicaid for reimbursement.

16. CO-CONSPIRATOR 2 was a resident of Laurel, Maryland and was employed as a CSW by QUALITY beginning in or about April 2022. As part of their duties, CO-CONSPIRATOR 2 caused claims to be submitted to Medicaid for reimbursement.

17. CO-CONSPIRATOR 3 was a resident of Bowie, Maryland and, beginning in or about January 2023, was employed as a nurse by QUALITY. At times, CO-CONSPIRATOR 3 also performed CSW work, supervised other employees, and reviewed encounter notes for approval. As part of their duties, CO-CONSPIRATOR 3 caused claims to be submitted to

Medicaid for reimbursement.

18. By submitting and causing the submission of encounter notes into Credible and to Medicaid for reimbursement, SONGAMBELE and the CO-CONSPIRATORS represented that the services were medically necessary and had been performed as documented in the encounter notes.

**Submission of Fraudulent MHRS Claims to Medicaid**

19. Beginning on or about January 2022, and continuing through on or about February 2025, SONGAMBELE and the CO-CONSPIRATORS knowingly submitted or caused to be submitted false and fraudulent MHRS clinical encounter notes, which were approved and submitted to Medicaid on behalf of QUALITY for reimbursement. Specifically, SONGAMBELE and the CO-CONSPIRATORS agreed and conspired to and did submit false and fraudulent MHRS encounter notes to Medicaid that grossly inflated the amount of time CSWs spent conducting MHRS, or were based on MHRS encounters that did not occur.

20. As part of the conspiracy and fraud scheme, SONGAMBELE instructed CSWs to bill four units, or approximately one hour, for all MHRS telehealth encounters, regardless of how much time a CSW actually spent on the telephone with a consumer, and even if the call only lasted a few minutes. CSWs at QUALITY understood that billing all services for four units was "the rule."

21. To avoid scrutiny from DBH, QUALITY management and SONGAMBELE trained CSWs and the CO-CONSPIRATORS to vary the times that they put in encounter notes in order to make the length of the phone call appear more realistic. CSWs were also instructed to pick a random time for the length of service, between 53 and 67 minutes, so that the time equaled four units. For example, CSWs would enter a telehealth encounter for 54 minutes, rather than 60 minutes, in order for QUALITY to bill Medicaid for four units.

22. In furtherance of the scheme, SONGAMBELE also instructed the CSWs and CO-CONSPIRATORS to "make sure to use" all 600 units for a consumer—the total amount of units authorized by Medicaid for a consumer during a 180-day period—without regard to medical necessity and without regard to whether the services had actually been performed.

23. SONGAMBELE also directed CSWs and the CO-CONSPIRATORS to take information learned during a single telehealth session and use it to create and document additional false and fraudulent MHRS encounters. For example, if a CSW only spoke to a consumer on a Monday, CSWs were instructed by SONGAMBELE to take information learned during that single encounter and spread it out over several days to create and document additional four-unit telehealth sessions throughout the remainder of the week. As a result, SONGAMBELE was aware that CSWs and the CO-CONSPIRATORS caused the submission of claims to Medicaid that sought payment for services that never occurred.

24. Despite knowing that Medicaid required encounter notes to be truthful and contain accurate information about services provided and the amount of time spent conducting a service, SONGAMBELE and the CO-CONSPIRATORS knowingly and intentionally caused the submission of such fraudulent encounter notes to Medicaid in order for QUALITY to claim reimbursement. During the course of the conspiracy, QUALITY received approximately $14,000,000 from Medicaid claim reimbursements. Based on a small sampling of Medicaid claims reviewed, almost all MHRS services billed by QUALITY were not supported by telephone records or consumer interviews.

**COUNT ONE**
**(Conspiracy to Commit Health Care Fraud – 18 U.S.C. § 1349)**

25. The allegations in paragraphs 1 through 24 of this Indictment are realleged and incorporated herein.

26. Beginning at least as early as January 2022 and continuing through at least February 2025, in the District of Columbia and elsewhere, the defendants,

**MWASI SONGAMBELE,**
**MAYA CHEYO, and**
**VANESSA KUH,**

did knowingly and willfully, combine, conspire, confederate, and agree with each other and others, known and unknown to the Grand Jury, to commit the offense of Health Care Fraud, in violation of Title 18, United States Code, Section 1347, by executing a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, D.C. Medicaid, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit program, in connection with the delivery of and payment for health care benefits, items, and services, in violation of Title 18, United States Code, Section 1349 (Conspiracy to Commit Health Care Fraud).

**Object of the Conspiracy**

27. The object of the conspiracy was for the defendants, and their co-conspirators, to unlawfully enrich themselves and/or QUALITY by submitting false and fraudulent encounter notes and claims to D.C. Medicaid.

**Manner and Means of the Conspiracy**

28. The manner and means by which the defendants and their co-conspirators sought to accomplish the goal of the conspiracy included, among others, the following:

a. Submitting and causing to be submitted for reimbursement falsified diagnostic assessments and clinical encounter notes for the provision of MHRS, that were not medically necessary and not provided as represented;

b. Submitting and causing to be submitted clinical encounter notes that falsely and grossly inflated the amount of time spent conducting MHRS services;

c. Submitting and causing to be submitted clinical encounter notes that contained false information in order to conceal the true nature of encounters and to avoid receiving scrutiny from DBH; and

d. Mass-approving clinical encounter notes without conducting a clinical review for accuracy and medical necessity, so that these claims could be submitted to Medicaid for reimbursement.

**(All in violation of Title 18, United States Code, Section 1349)**

**COUNTS TWO TO NINE**
**(Health Care Fraud – 18 U.S.C. § 1347)**

47. The allegations in paragraphs 1 through 46 of this Indictment are realleged and incorporated herein.

48. On or about the dates listed below, in the District of Columbia and elsewhere, the defendants,

**MWASI SONGAMBELE,**
**MAYA CHEYO, and**
**VANESSA KUH**

together with others, known and unknown to the Grand Jury, did knowingly and willfully execute, and attempt to execute, a scheme and artifice to defraud the D.C. Medicaid program, a health care benefit program, as defined in 18 U.S.C. § 24(b), and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the control of D.C. Medicaid, in connection with the delivery of and payment for health care benefits, items, and services, namely Mental Health Rehabilitative Services.

**Purpose of the Scheme**

49. It was a purpose of the scheme for defendants MWASI SONGAMBELE, MAYA CHEYO, and VANESSA KUH, and others, to unlawfully enrich themselves by, among other things, submitting and causing to be submitted, false and fraudulent encounter notes and claims for payment to D.C. Medicaid for MHRS that were not provided as claimed.

**Acts in Execution of the Scheme and Artifice**

50. On or about the dates specified below, in the District of Columbia and elsewhere, the defendants MWASI SONGAMBELE, MAYA CHEYO, and VANESSA KUH,, in connection with the purported delivery of health care benefits, items, and services, and/or aided and abetted by and aiding and abetting others known and unknown to the Grand Jury, did knowingly and willfully execute, and attempt to execute, the above-described scheme and artifice to defraud D.C. Medicaid, a federal health care program affecting commerce, as defined in Title 18, United States Code, Section 24(b), and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, any money or property owned by or under the custody of control of, said health care benefit program, by submitting or causing to be submitted the following false and fraudulent claims for reimbursement to D.C. Medicaid, all of which are not supported by the relevant call logs, cellphone location data, and consumer interviews:

| Count | Medicaid Beneficiary | Date Range | Defendant | Units Billed |
|---|---|---|---|---|
| 2 | M.S., R.E. | 9-11-23 to 9-13-23 | CHEYO | 16 |
| 3 | E.G., M.G., I.G. | 11-18-24 to 11-19-24 | CHEYO | 15 |
| 4 | A.J. | 12-5-22 to 12-9-22 | KUH | 14 |
| 5 | D.H. | 1-30-23 to 2-3-23 | KUH | 14 |
| 6 | G.R, | 4-9-23 to 4-15-23 | SONGAMBELE | 20 |
| 7 | A.P. | 4-7-24 to 4-20-24 | SONGAMBELE | 20 |
| 8 | A.G. | 4-9-23 to 4-15-23 | SONGAMBELE | 20 |
| 9 | D.W. | 4-9-23 to 4-15-23 | SONGAMBELE | 20 |

**(All in violation of Title 18, United States Code, Section 1347, and Aiding and Abetting and Causing an Act to Be Done, in violation of Title 18, United States Code, Section 2)**

**COUNT TEN**
**(Conspiracy to Commit Money Laundering - 18 U.S.C. § 1956(h))**

51. The allegations in paragraphs 1 through 50 of this Indictment are realleged and incorporated herein.

52. Beginning at least as early as September 2023 and continuing through at least January 2025, in the District of Columbia and elsewhere, the defendant,

**MWASI SONGAMBELE**

together with CO-CONSPIRATOR 1, and others known and unknown to the Grand Jury, did knowingly conspire, combine, confederate, and agree to commit the offense of laundering of monetary instruments, in violation of 18 U.S.C. § 1956(a)(1)(B)(i), by conducting and attempting to conduct financial transactions affecting interstate commerce, that is, the deposit, withdrawal, and transfer of funds to and from financial accounts, which involved the proceeds of specified unlawful activity, that is, health care fraud in violation of Title 18, United States Code, Section 1347, knowing that the property involved in these financial transactions represented the proceeds of some form of unlawful activity, and knowing that the transactions were designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity, health care fraud, in violation of 18 U.S.C. § 1956(h).

**Object of the Conspiracy**

53. The object of the conspiracy was for SONGAMBELE to hide her control over QUALITY, and to hide and conceal the fact that she was receiving funds from D.C. Medicaid derived from fraudulent claims, and to unjustly enrich herself.

**Manner and Means**

54. The manner by which SONGAMBELE would and did carry out the objectives of the conspiracy during the times relevant to the Indictment included transferring the proceeds of the unlawful activity from QUALITY's bank account to bank accounts controlled by CO-CONSPIRATOR 1, and then directing CO-CONSPIRATOR 1 to send back that money to SONGAMBELE.

*Specific Transactions*

55. On March 15, 2024, SONGAMBELE caused a Zelle payment to be sent from a JPMorgan Chase Total Business Checking account ending in x2628 ("QUALITY x2628") in the name of "QUALITY CARE SERVICES LLC" to CO-CONSPIRATOR 1's JPMorgan Chase bank account ending in x2246 ("JPMorgan Chase x2246") in the amount of $5,000. That same day, at the direction of SONGAMBELE, CO-CONSPIRATOR 1 caused a Zelle payment to be sent in the same amount to SONGAMBELE's JPMorgan Chase x8075 bank account ("JPMorgan Chase x8075").

56. On April 9, 2024, SONGAMBELE caused a Zelle payment to be sent from QUALITY x2628 to JPMorgan Chase x2246 in the amount of $2,500. That same day, at the direction of SONGAMBELE, CO-CONSPIRATOR 1 caused a Zelle payment to be sent in the same amount to JPMorgan Chase x8075.

57. On May 29, 2024, SONGAMBELE caused a Zelle payment to be sent from QUALITY's Truist bank account ending in x2925 to JPMorgan Chase x2246 in the amount of $2,000. The next day, at the direction of SONGAMBELE, CO-CONSPIRATOR 1 caused a Zelle payment to be sent in the same amount to JPMorgan Chase x8075.

58. On June 14, 2024, SONGAMBELE caused a Zelle payment to be sent from a Truist bank account ending in x2933 in the name of "Quality Healthcare Services LLC" ("QUALITY x2933") to JPMorgan Chase x2246 in the amount of $3,000. The same day, at the direction of SONGAMBELE, CO-CONSPIRATOR 1 caused a Zelle payment to be sent in the same amount to JPMorgan Chase x8075.

59. On July 24, 2024, SONGAMBELE caused a Zelle payment to be sent from QUALITY x2628 to JPMorgan Chase x2246 in the amount of $2,500. That same day, at the direction of SONGAMBELE, CO-CONSPIRATOR 1 caused a Zelle payment to be sent in the same amount to JPMorgan Chase x8075.

60. On or about September 17, 2023, SONGAMBELE provided a $20,000 check from QUALITY x2628 to CO-CONSPIRATOR 1 and requested that it be deposited into CO-CONSPIRATOR 1's Wells Fargo bank account ending in x5457 ("Wells Fargo x5457"). At the direction of SONGAMBELE, on both September 21, 2023, and September 23, 2023, CO-CONSPIRATOR 1 withdrew $10,000 from Wells Fargo x5457 and provided the funds to SONGAMBELE.

61. On or about December 27, 2024, SONGAMBELE provided a $45,000 check from a Truist bank account ending in x2925 in the name of "Quality Healthcare Services LLC" ("QUALITY x2925") to CO-CONSPIRATOR 1 and requested that it be deposited into CO-CONSPIRATOR 1's JPMorgan Chase bank account ending in x6989 ("JPMorgan Chase x6989"). At the direction of SONGAMBELE, CO-CONSPIRATOR 1 made the following withdrawals from JPMorgan Chase x6989, which he remitted to SONGAMBELE:

a. $8,000 on or about January 13, 2025.

b. $9,000 on or about January 14, 2025.

c. $9,000 on or about January 21, 2025.

d. $9,000 on or about January 24, 2025.

**(All in violation of Title 18, United States Code, Section 1956(h))**

## FORFEITURE ALLEGATIONS

### FORFEITURE ALLEGATION AS TO COUNTS ONE TO NINE

1. Upon conviction of any of the offenses alleged in Counts ONE through NINE of this Indictment, defendants shall forfeit to the United States pursuant to Title 18, United States Code, Section 982(a)(7), any property real or personal, that constitutes or is derived directly or indirectly, from gross proceeds traceable to the commission of the offenses.

2. The United States will also seek a forfeiture money judgment against the defendants equal to the amount of proceeds upon conviction of the offenses in Counts ONE through NINE.

3. Upon conviction of the offense alleged in Count TEN of this Indictment, the defendants shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1), any property, real or personal, involved in such offense, and any property traceable to such property. The United States will also seek a criminal forfeiture money judgment against the defendants in an amount equal to the value of any property, real or personal, involved in such offense.

4. The specific property to be forfeited includes, but is not limited to, the following:

a. 2024 Mercedes-Benz G550W4 (VIN: W1NYC6BJ9RX517233)

b. 2023 Mercedes-Benz G550W4 (VIN: W1NYC6BJ6PX468019)

c. 2022 Mercedes-Benz 2500 Cargo Van (VIN: W1Y4DDHY3NT082993)

d. 2020 Mercedes-Benz C300W4 (VIN: WDDWF8EB1LR560651)

e. 2023 Rover Defender (VIN: SALE2EEU1P2196806)

f. The real property, improvements, appurtenances, and any interest therein, located at 7165 Tranquility Road Laurel, MD 20723.

g. Panthere De Cartier Watch, Medium Model (Individual Number: 4119215717DY)

5. If any of the property described above, as a result of any act or omission of the defendant(s):

a. cannot be located upon the exercise of due diligence;
b. has been transferred or sold to, or deposited with, a third party;
c. has been placed beyond the jurisdiction of the court;
d. has been substantially diminished in value; or
e. has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1) and Title 28, United States Code, Section 2461(c).

**(Criminal Forfeiture, pursuant to Title 18, United States Code, Section 982(a)(1) and (a)(7), Title 21, United States Code, Section 853(p))**

A TRUE BILL:

FOREPERSON

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

By: ______________________
John W. Borchert, Chief
Fraud, Public Corruption & Civil Rights Section